Vassilios ARVANITIS, Libelant,

v.

BASSA TRANSPORTATION CORP. and Overseas Transportation Corporation, Respondents.

United States District Court
S. D. New York.
May 5, 1960.

Jerome Golenbock, New York City, for libelant.

Hammerman & Dolgin, New York City, for respondents.

McGOHEY, District Judge.

This is a suit for damages resulting from injuries allegedly sustained at sea by the chief steward of the S. S. Bassa in 1957.[1]

The Court's findings and conclusions are set forth in this opinion.

The libelant is a citizen of Greece where he is presently residing, having been deported from the United States on August 22, 1958.

The respondent Bassa Transportation Corporation is a Liberian corporation. It is the owner of the S. S. Bassa, a Liberian Flag vessel.

The respondent Overseas Navigation Corporation is a New York corporation. It managed and operated the vessel as agent for the owner.

The libelant claims injuries to his back on two occasions: the first, some time between May 4 and May 25, 1957, while the vessel was proceeding from Holland to the United States; the second, some time between July 11 and July 26, 1957, while the vessel was proceeding from Canada to Germany. The libel alleged lack of medical care while he was at sea and also after the vessel returned to the United States at the end of August, 1957. During the trial the claim of lack of care at sea was withdrawn.

---

1. This suit was brought on for trial before Judge Levet in April, 1959. The proctors for the parties thereafter agreed to a settlement and the libelant's proctor asked leave to discontinue the suit. This was granted and an appropriate order was entered. When the libelant's release was not forthcoming by the middle of November, 1959, the respondents' proctors moved to set aside the order of discontinuance and to restore the case to the trial calendar. This was opposed and Chief Judge Ryan granted the libelant's proctor two adjournments to secure the release. It was not secured by February 2, 1960, and the Chief Judge thereupon entered an order setting aside the order of discontinuance and setting the case for trial during the April 1960 term.

When the libelant left the vessel at Norfolk, Virginia in August 1957, he was unquestionably suffering from some disability of his lower back. He then asked for medical aid and was sent by the vessel's local agent to a doctor at Norfolk. This doctor recommended treatment in New York, where the libelant wished to go. He was examined and treated in New York from August 23 to October 17 by doctors engaged by the respondents, for what they diagnosed as a severe strain or sprain of the lower back. On' October 17, a Dr. Smith, to whom he was then sent by his own proctors, diagnosed his condition as severe back sprain and a possible disc herniation. On October 17, the libelant had long overstayed the shore leave allowed an alien seaman and the Immigration officials had called on the respondents to repatriate him. They made arrangements to do so but, because he continued to complain, they arranged for him to be hospitalized on October 18, at University Hospital in New York for treatment by the respondents' doctors. His condition was diagnosed as chronic low back strain and he was given extensive, though conservative, physiotherapy for about three weeks. He was also given a back brace. Although he was far from a "cooperative" patient, the doctors found his condition improved "markedly." Upon his discharge from University Hospital on November 11, 1957, the respondents' doctors pronounced him fit for duty after four weeks' additional rest. He did not return to work, nor did he leave the country.

On January 8, 1958, he sought treatment at the United States Public Health Service out-patient clinic in New York. There, after examination, he was given further physiotherapy for "low back sprain" until January 29, 1958. He was then directed to go to the Public Health Service Hospital on Staten Island for further examination. He did not report there until February 14, 1958. He was hospitalized there and after one week was discharged. The diagnosis was "chronic lumbo-sacral strain, mild." His condi-

tion was found "improved" and he was found and declared to be "fit for travel to Greece for further care there if necessary."

The respondents, at the insistence of the Immigration authorities, again made arrangements for his transportation to Greece but he did not depart. On the contrary, in the words of his proctor, he "disappeared." The Immigration authorities were unable to locate him, and his proctor did not see or hear from him until some time in May 1958. He was then a patient in Bellevue Hospital, New York, where, under circumstances not disclosed, he had been admitted on April 28, 1958. He later underwent surgery there and remained in the hospital until August 22, 1958, when he was discharged to the custody of Immigration officers who presumably brought him directly to the ship on which he that day sailed for Greece.

The operation disclosed a degenerative condition of the vertebrae and one of the intervertebral discs in the lumbo-sacral area. A very small amount of extruded disc material was removed and a spinal fusion was performed. No evidence was offered concerning his condition or his work record since his discharge from Bellevue.

The degenerative condition long antedated his service on the Bassa. It was not caused by any injury he may have sustained on that vessel.

The first of his claimed injuries is alleged to have occurred on or about May 15, 1957. The vessel was then eleven days out of Rotterdam from which she had sailed on May 4 for Galveston, Texas. The libelant's testimony was introduced through his deposition taken in November, 1957. In it he testified that while carrying a crate of chickens in the refrigerator, its outer door swung free and the edge of it struck the right side of his back just above the buttocks, throwing him forward; that prior to entering the refrigerator he had fastened the door to keep it open, by means of a permanently affixed hook designed for that purpose; that, moreover, he had tied the hook in

place on the door with "a little piece of string" because, he said, the hook was, in his opinion, in poor condition and he had previously complained of this to the first mate and the master. He conceded that the weather was good and the ship was rolling only "a little." The contention is that the vessel was unseaworthy because the hook was defective and became disengaged in mild weather even though tied down, and allowed the door to swing free and strike the libelant.

He claims he promptly reported this accident to the chief mate; that the latter gave him some liniment to rub on his back; and that he did this. The log contains no entry of this accident. It is undisputed that, as noted in the log, this mate left the vessel in Quebec on June 22, 1957. He was not called by either party and no deposition of his was introduced. It is conceded that the libelant did not report this first alleged injury to the master then or at any time prior to a few days after the second alleged injury in July; and that after the first alleged injury he continued to perform his regular duties each day. He did not sign off when the vessel arrived at Galveston, Texas on May 25.

Between that day and July 11, the vessel was in port a total of 32 days. Four of these were in Galveston and 28 were in the Canadian ports of Sorel, Quebec and Montreal, where, respectively, she stayed 4, 10 and 14 days. It is conceded that the libelant neither sought nor received medical aid at any of these ports, and continued to perform his regular duties daily.

The vessel left Montreal on July 11 and proceeded to Bremerhaven, Germany, where she arrived on July 26. The second injury is alleged to have been sustained during this voyage in the following manner. According to the libelant, while he was moving a small empty olive keg which weighed between eight and ten pounds, he was seized with severe pain in his lower back and right leg and became unable to straighten his back. This event, concededly, was not reported to

any officer at the time. It is undisputed, however, that several days later, while the libelant was serving coffee in the master's quarters, he reported this incident and then for the first time, told the master that, during the earlier voyage from Rotterdam to Galveston, he had been struck by the refrigerator door. The master prescribed rest and warm baths. He also directed the mate to massage the back and apply plasters to it. This was done. The libelant did not rest but continued to perform his regular duties each day. When the vessel reached Bremerhaven the master sent him to a doctor who gave him an injection and pills to relieve pain. The vessel was in Bremerhaven for six days. He did not return to the doctor. Neither did he again ask for medical aid until the vessel returned to Norfolk on or about August 27. In the interval he performed his regular duties daily.

 I do not credit the libelant's testimony that he was struck by the refrigerator door. I find he was not. As chief steward, he saw the master frequently. It is surely a fair inference that if he had been struck and injured by the door because of the failure of the hook to hold it open, he certainly would have reported this promptly to the master, if only to buttress the validity of his alleged prior complaints to the master about the hook. I find accordingly. The master testified he saw the hook on his regular weekly inspections and found it all right. He was not, of course, without interest in the litigation. But neither was the libelant. The hook was not repaired after the alleged accident and, as shown in the exhibits, appears to me to be altogether adequate for its purpose. I find it was. I do not believe it could have or did become disengaged from the door in the concededly mild weather prevailing. The vessel was not unseaworthy by reason of the hook. There was no failure or neglect on the part of the owners, agents or fellow crew members to keep the hook in good condition. Finally, I do not believe that if he had been struck by the

door and injured, he would have failed to demand medical aid during the 32 days he was in port in the United States and Canada between May 25 and July 11. The libelant was an experienced seaman. He had been serving in merchant vessels for thirty years; the last twenty, as a chief steward. He was quite aware of his right to receive free medical care, as his prior medical history shows.

■ It is certainly possible and indeed probable that, in moving the empty keg, small and light though it was, his already diseased back gave way and he suffered a severe and painful aggravation of his existing condition. I find he did. The job of moving the keg, however, was not beyond the ability of the ordinary ship's steward to handle alone. Furthermore, he had not asked for assistance to move the keg. I find therefore, that, though he was thus disabled in the ship's service, this was not caused by any negligence of the owner, its agents or any of the libelant's crew members; nor by any unseaworthy condition of the vessel.

The conclusion of the respondents' doctors on November 11, 1957, that the libelant would be fit for duty after four weeks' convalescence is rejected. It is significant that the United States Public Health Service doctors did not find him "fit for duty" when they discharged him on February 14, 1958.

■ I find the libelant had not attained maximum cure until two months after he was discharged from Bellevue Hospital August 22, 1958.

■ Accordingly, the libelant is entitled to an award of the amount of the Bellevue Hospital bill and maintenance, at the same rate as has already been paid him, for the period from the last day for which he has already been paid maintenance up to October 22, 1958, less the days spent in Bellevue Hospital and also on the vessel where he was supplied room and board at the respondents' expense until the vessel arrived in Greece.

A decree in accordance herewith may be entered on five days' notice.